**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| HONDA JET LIMITED, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19cv1046 |
| | ) | |
| HONDA AIRCRAFT COMPANY, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommendation on (1) "Plaintiff's Motion for Summary Judgment" (Docket Entry 41) (the "Plaintiff's Motion"); (2) "Honda Aircraft Company's Motion for Summary Judgment" (Docket Entry 43) (the "Defendant's Motion"); (3) "Honda Aircraft Company's Motion to Exclude Plaintiff's Expert Witnesses Chris Gillis and William 'Bo' Fielding" (Docket Entry 47) (the "Expert Motion"); and (4) "Honda Aircraft Company, LLC's Motion to Strike Plaintiff's March 8, 2021 Notice" (Docket Entry 60) (the "Motion to Strike"). For the reasons that follow, the Court should deny Plaintiff's Motion, grant Defendant's Motion, deny the Expert Motion as moot, and grant the Motion to Strike in part.

## I. Procedural History

Alleging breach of warranty in connection with the purchase of an aircraft, Honda Jet Limited, L.L.C. (the "Plaintiff") initiated this action against Honda Aircraft Company, LLC (the "Defendant"). (See Docket Entry 1 (the "Complaint"), ¶¶ 1, 5-6, 17-22.) Defendant answered the Complaint (Docket Entry 10), and the parties commenced discovery (see Text Order dated Dec. 13, 2019 (adopting, with one clarification, joint Rule 26(f) Report)). Thereafter, Plaintiff moved for summary judgment. (See Docket Entry 41; see also Docket Entry 42 (supporting memorandum).) Defendant responded in opposition (Docket Entry 52), and Plaintiff replied (Docket Entry 57). Defendant likewise sought judgment in its favor via Defendant's Motion (Docket Entry 43; see also Docket Entry 44 (supporting memorandum)), which also stands fully briefed (see Docket Entries 55, 58).

## II. Allegations

In this action, Plaintiff has alleged that Defendant violated its contractual warranty obligations by failing to deliver an aircraft "that was free and clear of defects and that would meet its essential purpose of providing safe transportation without material downtime to address problems, including faulty electronics" (Docket Entry 1, ¶ 1). According to the Complaint (and attachments thereto):

-2-

In 2006, Plaintiff entered into an agreement (Docket Entry 1-8) (the "Agreement") with Defendant "for the future purchase of a HondaJet Aircraft" (the "Aircraft"). (Docket Entry 1, ¶ 10.) After amendments to the Agreement (see id., ¶ 12),[1] Plaintiff accepted delivery of the Aircraft in March 2017 (id., ¶ 13). According to Plaintiff, "[t]he Aircraft failed to conform to the [ A]greement and the warranty provided." (Id., ¶ 14.)[2] More specifically, "[s}ince the purchase of the Aircraft, [Plaintiff] has been required to return the Aircraft to North Carolina for the repair of many substantial and material defects." (Id., ¶ 16.) Plaintiff attached as exhibits to the Complaint invoices and other records documenting such repairs. (Id., ¶ 15 (incorporating Docket Entries 1-1, 1-2).) The Complaint alleges that "[Plaintiff] has incurred significant expense and damages as a result of these

---

[1] Amendment 1, executed January 21, 2014, effectuated changes to the Agreement not relevant here, to include updating Defendant's name, extending the time for delivery, and modifying a payment term. (See Docket Entry 1-9 at 2-3.) Amendment 2, which the parties signed on February 23, 2015, confirmed the Aircraft's serial number, Plaintiff's "optional equipment and interior and exterior selections," and the price of such selections. (See Docket Entry 1-10 at 2-3.)

[2] The Complaint alleges, "[o]n information and belief, [that] no . . . written warranty [other than a preliminary one in the Agreement] was issued at the time of [] delivery." (Docket Entry 1, ¶ 13.) In connection with the briefing on Plaintiff's Motion and Defendant's Motion, however, the parties tendered a document titled Amendment 4, executed in 2016, which purports to contain the operative warranty provision. (See Docket Entries 42-1, 45-2.)

-3-

required repairs and the related downtime that has prevented its use of the Aircraft." (Id., ¶ 16.)

Based on the foregoing, the Complaint lodges a breach-of-warranty claim against Defendant. (Id., ¶¶ 17–22.)  In particular, the Complaint alleges that, "[b]y its conduct, including the sale to [Plaintiff] of the defective Aircraft, [Defendant] has breached its warranty to [Plaintiff]."  (Id., ¶ 18.)  As a remedy, the Complaint seeks "judgment against [Defendant] for all expenses and other damages incurred by [Plaintiff]" (id., ¶ 19), as well as an order "requiring [Defendant] to replace the Aircraft with a similar aircraft that is free of defects and is airworthy" (id., ¶ 20).[3]

### III. The Record

In support of their respective positions, the parties submitted numerous exhibits, including, inter alia, a declaration by one of Defendant's senior managers, James Schofield ("Schofield") (Docket Entry 45) (the "Schofield Declaration"); copies of agreements between the parties (to include the "Final Warranty" (Docket Entry 45-2 at 26–30));[4] the Aircraft's maintenance entries and logbooks (and associated invoices) (Docket Entries 42-5, 42-13, 42-15, 42-16, 42-19, 42-36, 45-4, 45-5);

---

[3] Under the Code of Federal Regulations, "[a]irworthy means the aircraft conforms to its type design and is in a condition for safe operation."  14 C.F.R. § 3.5(a).

[4] Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.

-4-

several service bulletins[5] (Docket Entries 42-18, 42-34, 42-35, 42-37) and airworthiness directives[6] (Docket Entries 42-11, 42-20, 42-21); Plaintiff's discovery requests and Defendant's responses (Docket Entries 46-13, 46-14); excerpts from several depositions (Docket Entries 42-3, 42-4, 42-6, 42-8, 42-14, 42-25, 42-28, 46-2, 46-4, 46-8, 46-9); flight logs pertaining to (i) the Aircraft (Docket Entries 46-5, 46-6) and (ii) two pilots who have flown it (Docket Entries 46-7, 46-16); Plaintiff's expert witness disclosures (Docket Entry 46-10 at 2–4); the reports from two such witnesses (id. at 6–8; Docket Entry 46-12); and various correspondence (Docket Entries 42-30, 42-38). The record reflects the following:

## A. Agreement and Final Warranty

The Agreement details many aspects of the transaction, to include "price and payment terms" (Docket Entry 1-8, ¶ 2 (all-caps font omitted)), "inspection and acceptance" (id., ¶ 5 (all-caps font omitted)), "default and termination" (id., ¶ 9 (all-caps font omitted)), "warranty provisions" (id., ¶ 11 (all-caps font

---

[5]    "[A service] bulletin is not unlike an automobile manufacturer's recall letter." Herndon v. Seven Bar Flying Serv., Inc., 716 F.2d 1322, 1326 (10th Cir. 1983).

[6]    The "[Federal Aviation Administration]'s airworthiness directives are legally enforceable rules that apply to . . . aircraft," 14 C.F.R. § 39.3, which issue when "[a]n unsafe condition exists in the [aircraft]; and . . . [t]he condition is likely to exist or develop in other [aircraft] of the same type design," 14 C.F.R. § 39.5.

omitted)), and "governing law" (id., ¶ 12 (all-caps font omitted)).

The Agreement describes the preliminary specifications of the

Aircraft and obligates Defendant to furnish Plaintiff with final

data before delivery. (See Docket Entry 1-8, ¶ 1; see also id. at

10 (preliminary specifications).) The first paragraph of the

warranty provision provides as follows:

> The Aircraft shall be furnished with the limited warranty
> provided in Exhibit C [an attachment to the
> Agreement] . . . . It is understood that Exhibit C is
> preliminary in content and is subject to revision by
> [Defendant]. [Defendant] will provide [Plaintiff] with
> the final limited warranty at the time of delivery of the
> final Specification under Section 1 of the Agreement,
> which warranty will be within what is reasonable and
> customary in the industry for an aircraft warranty. The
> final warranty in the form of a revised Exhibit C, shall
> be incorporated herein by reference and shall supersede
> and replace the preliminary version or the prior updated
> version, as applicable. Any customer support services
> package (if agreed to by the Parties) will be agreed to
> separately.

(Id., ¶ 11.)

Under the Agreement, Plaintiff bore the obligation to inspect

the Aircraft prior to acceptance (id., ¶ 5(a)) and notify Defendant

about any discrepancies, to include deviations from "the warranted

condition of the Aircraft (including workmanship) . . . [that] has

a material effect on the Aircraft's appearance, operation or

performance" (id., ¶ 5(b)). The parties further agreed that "any

discrepancies discovered or alleged after [acceptance] shall be

subject only to the rights and remedies available to [Plaintiff]

under the Warranty, if and to the extent available." (Id.) The

-6-

parties chose North Carolina law to govern the Agreement. (Id., ¶ 12.)

On April 11, 2016, the parties signed Amendment 4, which replaced the preliminary warranty provision in the Agreement. (Docket Entry 45-2 at 2 ("Pursuant to Section 11 of the Agreement, Exhibit C is hereby deleted and replaced with the warranty section in Exhibit A - Aircraft Specification and Description attached to this Amendment.").) In particular, "[Defendant] warrant[ed] to [Plaintiff] that, at the time of the initial delivery to Plaintiff, . . . the Aircraft shall be free from defects in material and defects in manufacture." (Id. at 26 (parenthetical omitted).) The Final Warranty defines a defect as "the breakage or failure of a part which is determined to [Defendant]'s satisfaction to be due to causes which are considered by [Defendant] to be within [its] control. Removal of a part from service because of hourly, cyclic or other limitations on its continued use will not constitute a defect." (Id. at 30.) Additionally, the Final Warranty excludes from coverage the "repair or replacement of consumable parts and materials (batteries, brakes, filters, gaskets, seals, O-rings, tires, etc.)." (Id. at 26.)

"[Defendant]'s sole obligation and liability for a breach of th[e foregoing] warranty is limited to repairing, replacing or correcting, at [Defendant]'s sole discretion, the defective part or

-7-

condition . . . ."  (Id.)[7]  Lastly, the Final Warranty provides, in

pertinent part:

> Except for the express terms of this warranty,
> . . . there are no other warranties, and [Plaintiff]
> hereby waives, releases and renounces any representations
> or warranties, expressed or implied, including warranties
> of merchantability or fitness for any particular purpose,
> and any obligations, liabilities, rights, claims or other
> remedies in tort of [Plaintiff] against
> [Defendant] . . . from [Defendant's] negligence (whether
> active, passive or imputed). <u>This warranty sets
> forth . . . the exclusive warranties, liabilities and
> obligations of [Defendant] . . . and the exclusive
> remedies available to [Plaintiff], whether under this
> warranty or otherwise, arising from any defect,
> nonconformity or problem of any kind in the [A]ircraft,
> component, equipment, accessory, part or services
> delivered by [Defendant]</u> . . . . No person or entity is
> authorized to make any other representations or
> warranties or to assume any obligations on behalf of
> [Defendant] . . . regarding this warranty. <u>Repair or
> replacement of the defective part or condition are the
> only remedies available under this warranty, and there
> are no other rights or remedies against
> [Defendant]</u> . . ., whether express or implied, arising by
> law, in contract, in tort or otherwise, with respect to
> any defect, non-conformance or deficiency in the
> [A]ircraft or related products or in any of the manuals,
> technical publications, information, instructions or
> other goods or services provided by [Defendant], or
> related to any modifications, repairs, or replacement
> parts that may hereafter be furnished by
> [Defendant] . . . .  In no event shall
> [Defendant] . . . have any liability for loss of or
> damage to the [A]ircraft other than repair or replacement
> of the defective part or condition.

---

[7]  The Final Warranty contemplates that Defendant or "a Honda
Aircraft Authorized Service Center ('ASC')" would perform any
necessary work on the Aircraft.  (See Docket Entry 45-2 at 26.)  In
describing such work, the Recommendation broadly uses the term
"Defendant" to include one such ASC that repaired the Aircraft for
Plaintiff on Defendant's behalf, Des Moines Flying Service, "a
certified service and maintenance facility" (Docket Entry 42-14 at
2).

> In no event shall [Defendant] . . . be liable for any incidental or consequential, special or punitive damages, whether arising out of contract, warranty or tort (including, without limitation, negligence, active or passive; imputed liability; or strict liability) or by statute or otherwise, <u>including</u> but not limited to loss of profits or goodwill, <u>loss of use, loss of time, inconvenience, loss of value or commercial loss</u>. The engines and avionics are separately warranted by their manufacturers, and no additional warranty is provided by [Defendant] . . . . Under no circumstances shall the aggregate liability under this warranty and any other manufacturer's warranty exceed [Defendant]'s suggested purchase price of the [A]ircraft. . . .

(<u>Id.</u> at 28-29 (emphasis added) (all-caps font omitted).)

## B. Records Documenting Use and Repair of Aircraft

According to the flight logs (the accuracy of which no party has disputed), Plaintiff began to use the Aircraft upon delivery and took multiple flights every month, beginning in March 2017 and continuing through October 2018. (<u>See</u> Docket Entry 46-5 at 2-13.) Within that same window, starting in April 2017, Plaintiff began to experience problems with the Aircraft. (<u>See</u> Docket Entry 42-13 at 1 (documenting replacement of "data concentrator unit" on April 17, 2017).) Later that year, the Aircraft required a repair for its "left engine high pressure regulating shut-off valve" (Docket Entry 45-4 at 12 (standard capitalization applied) (entry dated June 10, 2017)) and a modification to its "compressor drive module" (<u>id.</u> (standard capitalization applied) (entry dated Aug. 2, 2017)).

In October 2017, after approximately 150 hours of use, the Aircraft underwent a series of repairs and maintenance. (<u>See</u> <u>id.</u> at 29-30.) The Aircraft leaked fuel when "topped off" (see <u>id.</u> at

-9-

29), which prompted troubleshooting and resulted in the discovery of a "valve installed upside down" (id. at 57). Proper installation of such valve remedied the fuel leak. (See id.) During that same service visit, Defendant repaired other parts of the Aircraft, to include replacing door placards, door seals, and stripped screws. (See id.) Defendant also "[i]nstalled [a] new ground recognition beacon" and "[s]erviced [the] hydraulic fluid" (id.).

In January 2018, the Aircraft returned for repairs to an "inoperative . . . yaw trim adapter" (Docket Entry 42-5 at 16 (standard capitalization applied)), as well as an "inoperative . . . cabin window shade" (id.). Around that time, Defendant also replaced the "generator control unit" after it failed. (Id. at 29 (all-caps font omitted).) In June 2018, Defendant "installed [a m]odified [p]ower [b]rake [v]alve" in "[c]ompli[ance] with . . . [a] [s]ervice [b]ulletin." (Docket Entry 45-4 at 13.) In September 2018, Defendant serviced the Aircraft's GPS antenna by remedying a loose connector. (See id. at 15.) The Aircraft's brakes required service again in October 2018, at which time Defendant "installed [an] overhauled . . . brake assembly" (id. at 17-18). Additionally, during October 2018, Defendant replaced part of the windshield after the original sustained "delamination and coating loss" (id. at 18).

-10-

In November 2018, around the time Defendant serviced a broken sensor on the Aircraft's wing (see id. at 19), Plaintiff expressed to Defendant that Plaintiff had "run out" of patience with the Aircraft and intended to revoke its acceptance (see Docket Entry 42-30 at 2). Defendant declined (see Docket Entry 42-32 at 1 (explaining that Defendant had resolved all "open issues" with the Aircraft as of November 8, 2018)), and Plaintiff eventually retrieved the Aircraft in December 2018 (see Docket Entry 46-5 at 13 (entry dated Dec. 7, 2018)). Plaintiff then resumed its consistent use of the Aircraft. (See id. at 13–16.)

In July 2019, the Aircraft underwent its 600-hour inspection. (Docket Entry 45-4 at 22–23.) During that inspection, a mechanic discovered a problem with the free-fall mechanism, an alternate means of lowering the landing gear. (See Docket Entry 42-23 at 1.) The mechanic attempted to fix the issue, but upon a test of the system, the "landing gear failed to extend" (id.). After further troubleshooting, the mechanic resolved a related problem (with the "dump lever" (id.) and confirmed proper functioning (see Docket Entry 45-4 at 22 (item 13)). Defendant reported the malfunction to the Federal Aviation Administration (see Docket Entry 42-23 at 1) but did not disclose the failed test to Plaintiff (see Docket Entry 45-4 at 22 (recording installation of "new free fall sector . . . and control arm" without documenting failed test)).[8]

---

[8] Plaintiff first learned during discovery in this action that the Aircraft's landing gear failed to lower via the free-fall

-11-

Various other maintenance and repairs occurred during the 600-hour inspection, including another modification to the Aircraft's brakes. (See id. (item 4).)

In September 2019, the Aircraft required service for an inoperative power outlet in the cockpit and for the "air conditioning system" (see id. at 24). In October 2019, Defendant installed another modified power brake valve. (See id. at 27.) Except for periods during which maintenance and repairs rendered the Aircraft unavailable, Plaintiff's frequent flights continued until February 2020, the final month in the original flight log. (See Docket Entry 46-5 at 16–19.) By that point, Plaintiff had flown the Aircraft for just under 700 hours. (See id. at 19.)

## C. Depositions and Schofield Declaration

Via depositions pursuant to Federal Rule of Civil Procedure 30(b)(6) ("Rule 30(b)(6)"), representatives for the parties have added context to the Aircraft's maintenance records, recounted Plaintiff's complaints about the Aircraft, and described Defendant's responses to those complaints. The topics of such testimony included the discovery of the improperly installed fuel valve, the significance of the defective free-fall mechanism, and Defendant's assessment of whether such issues (among others) constituted "defects," as well as Plaintiff's dissatisfaction with the Aircraft's braking system and tire wear.

---

mechanism. (See Docket Entry 42 at 15.)

During one Rule 30(b)(6) deposition, Schofield confirmed that the incorrect installation of a valve allowed jet fuel to "leak[] into the [Aircraft]'s fuselage and" gather at "the low point[,] . . . the [ground recognition] beacon" (Docket Entry 42-6 at 27). Schofield acknowledged that such error, in Defendant's view, constituted an "[i]nstallation defect" (id. at 28). As concerns the Aircraft's free-fall mechanism, aircraft mechanic Josh Boyd explained that such mechanism functioned "[t]o extend the landing gear in the event the hydraulic pressure is not available." (Docket Entry 42-14 at 6.) He testified that the failure of both the main landing gear and the free-fall mechanism would leave a plane "without . . . functioning landing gear" (id.). Defendant likewise has acknowledged that such condition qualifies as a defect. (See Docket Entry 42-6 at 37.)

Notwithstanding their agreement on the foregoing subjects, the parties have disputed whether the free-fall mechanism remained operational between delivery in March 2017 and repair in July 2019. Plaintiff has highlighted the fact that the landing gear failed to lower during the 600-hour inspection (see Docket Entry 42-23 at 1) and Defendant's admitted belief that the Aircraft "left the factory" (Docket Entry 42-6 at 35-36) with three distinct installation defects affecting the free-fall mechanism (see Docket Entry 42-25 at 8 (describing "out of rig" sector, incorrectly installed clevis pins, and backwards dump lever)). (See Docket

-13-

Entry 42 at 9–10; Docket Entry 57 at 5–6.)  For its part, Defendant has emphasized that the Aircraft failed the free-fall test only after a mechanic had corrected two of the three problems (see Docket Entry 42-14 at 4–5) and that the free-fall mechanism functioned (despite all three installation errors) during the Aircraft's pre-delivery operational check (see Docket Entry 42-6 at 23–24; see also id. at 52 (confirming "[Defendant]'s position . . . that the emergency landing gear system would have worked properly before the 600-hour inspection")).  (See Docket Entry 52 at 13–14.)[9]

Turning to other components of the Aircraft, Schofield testified (in a representative capacity) that Defendant regarded certain issues as warrantable defects.  In particular, Schofield admitted that the following problems constituted defects: "[the] [f]ailure of yaw trim crew alerting system" (Docket Entry 45, ¶ 13 (item p); see also Docket Entry 42-6 at 3);[10] the "inoperable cabin

---

[9]     As grounds for Defendant's position, the Schofield Declaration asserts that "[Defendant] performs a functional test of the emergency backup system for lowering the landing gear . . . [d]uring production" (Docket Entry 45, ¶ 14(c)) and that such "system operated correctly" on the Aircraft prior to delivery (id.).  Schofield explained during his deposition that Defendant investigated the failure of the free-fall mechanism after the 600-hour inspection and learned, based on documentation, that the supposedly successful pre-delivery free-fall test had occurred on January 18, 2017.  (See Docket Entry 42-6 at 32–33.)

[10]    The description of such defect appears in the Schofield Declaration, not in his deposition testimony.  The excerpt of the latter omits part of the question posed to Schofield such that it does not identify what component he identified as defective.  (See Docket Entry 42-6 at 3 (Schofield discussing "crew alert system"

-14-

window shade" (Docket Entry 42-6 at 4); the malfunction of the Aircraft's "bleed sensor" (id. at 5); "the [potentially faulty] power brake valve" (id. at 8); an "O ring . . . [potentially] damaged during the assembly process" (id. at 9);[11] and the deterioration of the windshield's protective coating (id. at 16–17). Via the Schofield Declaration, Schofield averred that Defendant has repaired each of the foregoing issues. (See Docket Entry 45, ¶ 13 (items p, q, r, s, and y).)[12]

Finally, during the Rule 30(b)(6) deposition of pilot Kevin Tyler ("Tyler"), Plaintiff elicited details about the Aircraft's braking system and tire wear. Having flown the Aircraft, Tyler described the braking system as "very jerky [and] erratic" (Docket Entry 42-8 at 5) and testified that he would only land the Aircraft on a "5000-foot . . . runway to make sure [the brakes] worked" (id. at 5–6). Tyler acknowledged, however, that the brakes had never

---

and "failed . . . component" without identifying component by name, before affirming that such component qualified as defect).)

[11] The record remains somewhat unclear about whether the o-ring problem constitutes a separate defect from the error affecting the power brake valve. (See Docket Entry 42-6 at 7–10 (Schofield first describing proactive replacement of power brake valve in accordance with service bulletin and then explaining failure of o-ring in power brake valve assembly).) One airworthiness directive in the record suggests that a defective o-ring caused the problem with the power brake valve. (See Docket Entry 42-11 at 2.)

[12] The Schofield Declaration fails to clarify when Defendant remedied the o-ring issue Schofield described during his deposition, if separate from the proactive replacement of the power brake valve. (See Docket Entry 45, ¶ 13 (item y) (referencing "issues" with power brake valve without mention of o-ring).)

"[f]ail[ed] to decelerate the [A]ircraft safely" (id. at 5). Later in the deposition, Tyler testified that Defendant had remedied the above-mentioned braking issues in July 2019 by modifying the brakes in accordance with "the service bulletin." (Docket Entry 46-2 at 8-9.) After that service, the Aircraft's brakes performed "[t]he way you would expect [them] to . . . out of the box initially." (Id. at 9.)

With respect to tire wear, Tyler explained that the positioning of the landing gear "creates a camber issue which [causes] extreme wear on the inside of the tires" (id. at 12). Tyler further described wear patterns as "uneven" (id. at 13) and confirmed that "premature tire wear" occurred as a result of the allegedly defective landing gear design (id. at 13-14). Tyler identified another service bulletin (relating to "the actuator") that addresses tire wear issues resulting from the positioning of the landing gear. (See id. at 12.) Given the recency of that bulletin at the time of his deposition, Tyler lacked information about whether the service bulletin's fix would resolve Plaintiff's complaint. (See id. at 88 ("The tire wear issue has not been fixed since that service bulletin is just now coming out.").) Tyler verified that, other than tire wear, no problems with the Aircraft remained outstanding at that time. (Id. at 88-89.)

-16-

<u>DISCUSSION</u>

**I. Relevant Standards**

**A. Summary Judgment**

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing absence of such dispute. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." <u>Henry v. Purnell</u>, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" <u>Miller v. Leathers</u>, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists

-17-

and summary judgment is improper." <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 959 (4th Cir. 1996).

However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." <u>Lewis v. Eagleton</u>, No. 4:08cv2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (unpublished) (citing <u>Baber v. Hospital Corp. of Am.</u>, 977 F.2d 872, 874-75 (4th Cir. 1992)), <u>aff'd</u>, 404 F. App'x 740 (4th Cir. 2010); <u>see also Pronin v. Johnson</u>, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment). Finally, factual allegations in a complaint or court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. <u>See Reeves v. Hubbard</u>, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011) (unpublished), <u>recommendation adopted</u>, slip op. (M.D.N.C. Nov. 21, 2011).

"When faced with cross-motions for summary judgment, the [C]ourt must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 (4th

Cir. 2003) (quoting <u>Philip Morris Inc. v. Harshbarger</u>, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).  The Court considers each motion individually and "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion."  <u>Id.</u> (quoting <u>Wightman v. Springfield Terminal Ry. Co.</u>, 100 F.3d 228, 230 (1st Cir. 1996)).

## B. Express Warranty

Transactions involving the sale of goods, including airplanes, fall within the scope of "North Carolina's version of Article 2 [('Article 2')] of the Uniform Commercial Code ('UCC')," <u>Prichard Enters., Inc. v. Adkins</u>, 858 F. Supp. 2d 576, 590 (E.D.N.C. 2012).[13]  Article 2 defines an "express warranty" as follows:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. . . .

---

[13]  The undersigned applies North Carolina law because federal courts sitting in diversity "must apply the substantive law of the forum state in resolving the parties' dispute, including the forum state's choice-of-law rules," <u>Wheels Sports Grp., Inc. v. Solar Commc'ns, Inc.</u>, 194 F.R.D. 527, 534 (M.D.N.C. 1999).  Plaintiff has invoked the Court's diversity jurisdiction (<u>see</u> Docket Entry 1, ¶¶ 5–7), such that the forum state's law applies.  The Agreement's choice-of-law provision selecting North Carolina law (Docket Entry 1-8, ¶ 12) obviates the need for an independent choice-of-law analysis, <u>see</u> <u>Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.</u>, 386 F.3d 581, 600–01 (4th Cir. 2004) ("North Carolina [courts] . . . typically give effect to contractual choice-of-law provisions.").

Case 1:19-cv-01046-LCB-LPA   Document 65   Filed 05/26/21   Page 19 of 36

N.C. Gen. Stat. § 25-2-313(1)(a)-(b). "A claim for breach of express warranty . . . requires proof of (1) an express warranty as to a fact or promise relating to the goods, (2) which was relied upon by the plaintiff in making his decision to purchase, (3) and that this express warranty was breached by the defendant." Harbour Point Homeowners' Ass'n, Inc. v. DJF Enters., Inc., 206 N.C. App. 152, 163, 697 S.E.2d 439, 447 (2010) (internal quotation marks omitted). "[T]he burden is on one who asserts [breach of warranty] to establish it by the greater weight of the evidence." Price v. Goodman, 226 N.C. 223, 229, 37 S.E.2d 592, 597 (1946); see also N.C. Gen. Stat. § 25-2-607(4) ("The burden is on the buyer to establish any breach with respect to the goods accepted.").

"Where an aggrieved party seeks to recover damages for breach of an express warranty, limited or otherwise, he must demonstrate both that he has fulfilled his own obligations under [the warranty] and that he has taken the steps required by Article 2." Stutts v. Green Ford, Inc., 47 N.C. App. 503, 511, 267 S.E.2d 919, 924 (1980). Article 2 provides that, after acceptance of goods, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." N.C. Gen. Stat. § 25-2-607(3)(a). "Where the buyer has accepted goods and given notification [of breach to the seller]. . . [the buyer] may recover as damages for any nonconformity of tender the loss resulting in the ordinary course

-20-

of events from the seller's breach as determined in any manner which is reasonable." Id. § 25-2-714(1). "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." Id. § 25-2-714(2).

However, "[an] agreement . . . may limit or alter the measure of damages recoverable under [ Article 2], as by limiting the buyer's remedies . . . to repair and replacement of nonconforming goods or parts . . . ." Id. § 25-2-719(1)(a). Courts enforce such agreements unless "circumstances cause a[] limited remedy to fail of its essential purpose," id. § 25-2-719(2), in which case "remedy may be had as provided [elsewhere in Article 2]," id. Additionally, "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." Id. § 25-2-719(3). When parties have agreed to a limited remedy, "[a] manufacturer or other warrantor may be liable for breach of warranty when it repeatedly fails within a reasonable time to correct a defect as promised." Stutts, 47 N.C. App. at 511, 267 S.E.2d at 924; see also id. at 512, 267 S.E.2d at 924 ("A party seeking to recover for breach of a limited warranty is not required to give the warrantor unlimited opportunities to attempt to bring the item into compliance with the warranty.").

-21-

## II. Analysis

### A. Preliminary Matters

Regarding the elements of Plaintiff's breach-of-warranty claim, no party disputes that an express warranty exists or that Plaintiff relied on such warranty in connection with its purchase of the Aircraft. (See Docket Entry 42 at 19 n.12 (noting lack of challenge by Defendant to Plaintiff's reliance); Docket Entry 44 at 16-18 (reflecting no discussion of existence of express warranty or Plaintiff's reliance).) However, the parties have offered somewhat divergent interpretations of the issue(s) that remain for consideration. According to Plaintiff, it has established Defendant's breach as a matter of law, in light of the terms of the Final Warranty (promising an Aircraft "'free from defects' in parts and manufacture") and Defendant's admissions that certain problems with the Aircraft constitute "defects." (Docket Entry 42 at 18-19.) For that reason, Plaintiff has asserted that Defendant's breach qualifies as "undisputed" for purposes of Plaintiff's Motion. (Id. at 19.) The remainder of Plaintiff's argument focuses on the appropriate remedy for such breach (to include avoiding the Final Warranty's limitations and exclusion of consequential damages). (See id. at 19-23.)

For its part, Defendant has asserted that "Plaintiff's claim founders on the breach element and on its inability to establish any recoverable damages." (Docket Entry 44 at 16.) Per Defendant,

no breach occurred because "[Plaintiff] cannot show that [Defendant] failed to repair or replace any defect under the [Final] Warranty . . . ." (Id. at 17.) In other words, Defendant has characterized the Final Warranty's repair-or-replace provision as a modification of Defendant's obligations in the Final Warranty, rather than a limitation on the remedy available to Plaintiff in the event of a breach (i.e., a warrantable defect). (See id. at 16–17.) Moreover, Defendant has emphasized that the only unresolved problem with the Aircraft, Plaintiff's dissatisfaction with the rate of tire wear, falls outside the scope of the Final Warranty. (See id. at 17–18.)

The parties have not thoroughly addressed how North Carolina courts would resolve whether the repair-or-replace provision constitutes (i) part of Defendant's warranty obligations, or (ii) a separate promise. (See Docket Entry 55 at 12 (citing products-liability case for proposition that defect at time of sale constitutes breach); Docket Entry 58 at 7–8 (generally relying on Stutts for proposition that no breach occurs until warrantor fails to repair or replace).) Independent research did not reveal any controlling authority precisely on point.

Under circumstances similar to those present here, North Carolina courts sometimes have described the failure to honor a repair-or-replace obligation as a "breach of warranty." Stutts, 47

-23-

N.C. App. at 511, 267 S.E.2d at 924 (emphasis added).[14] However, such obligation does not fit comfortably within Article 2's definition of an "express warranty." N.C. Gen. Stat. § 25-2-313(1)(a)-(b); see also Grosse Pointe Law Firm, PC v. Jaguar Land Rover N. Am., LLC, 317 Mich. App. 395, 404, 894 N.W.2d 700, 705 (2016) ("Goods cannot 'conform' to a promise to repair or replace because such a promise says nothing about the character or quality of the goods, but rather identifies a remedy if the buyer determines that the goods are defective."). Additionally, North Carolina law provides that "[r]emedies for breach of warranty can be limited in accordance with the provisions of [ A]rticle [2] on liquidation or limitation of damages and on contractual modification of remedy . . . ." N.C. Gen. Stat. § 25-2-316(4) (emphasis added) (citing N.C. Gen. Stat. §§ 25-2-718 and 25-2-719). Notably, the contractual repair-or-replace modification appears in

---

[14]    More specifically, without distinguishing between the promise of a defect-free good and the promise to repair or replace defective parts, Stutts discerned sufficient evidence of breach when a seller of a new truck had promised to repair or replace "[a]ny part [found to be defective in factory material or workmanship] during the first 12 months or 12,000 miles of operation, whichever is earliest," id. at 511, 267 S.E.2d at 924, and when, "[a]t the end of the warranty period, . . . [the] plaintiff's truck continued to leak oil despite numerous attempts by [seller and an authorized dealer] to discover the cause and to correct it," id. Similarly, a purchaser of a new automobile established breach (of a materially similar repair-or-replace promise) when the vehicle manifested problems with its oil and coolant systems and "[the dealer] refused to further repair [the vehicle] only 10 months after purchase and within the 12[-]month warranty period." Riley v. Ken Wilson Ford, Inc., 109 N.C. App. 163, 170, 426 S.E.2d 717, 722 (1993).

an above-cited part of Article 2 entitled "Remedies." N.C. Gen. Stat. § 25-2-719.

Courts outside North Carolina generally have "distinguish[ed] between a warrantor's] 'repair or replace' promise [and] its promise that [a good] would be free from defects," Mississippi Chem. Corp. v. Dresser-Rand Co., 287 F.3d 359, 366 (5th Cir. 2002) (interpreting materially identical provisions of Mississippi UCC). See also Grosse Pointe Law Firm, 317 Mich. App. at 406, 894 N.W.2d at 706 ("[P]romises to repair or replace defective goods are contractual promises under Article 2 [of the materially identical Michigan UCC], but are not warranties."); Cosman v. Ford Motor Co., 285 Ill. App. 3d 250, 259, 674 N.E.2d 61, 67 (1996) (noting that "[repair-or-replace] promise relates to [the seller's] obligations under the contract, not to the quality of the goods"); but see Woolums v. National RV, 530 F. Supp. 2d 691, 698 (M.D. Pa. 2008) (concluding "that the repair-or-replace covenant is an express warranty governed by Article 2 of the Pennsylvania [UCC]"). As one scholar has framed the foregoing divide:

> Although some courts look at an undertaking to repair or replace the goods as an express warranty in that it is a promise which becomes part of the basis of the bargain, in reality, it does not constitute an express warranty that there is no defect in the goods. Rather, it is merely a promise to repair or replace within the period of time of the warranty in question, and is treated by Article 2 as a limitation of the remedy.

4B Anderson U.C.C. § 2-719:68 (3d. ed.) (internal footnotes omitted).

Here, based on the plain language of Article 2, the Court should assume that North Carolina courts would differentiate between Defendant's promise of a defect-free Aircraft at the time of delivery and its promise (within certain parameters) to repair or replace defective parts or conditions. Such approach properly focuses on whether and to what extent Defendant breached one or both obligations, as to each part or condition Plaintiff has identified. Viewing the evidence in the light most favorable to Plaintiff, the record supports the notion that the errors affecting the Aircraft's fuel valve and free-fall mechanism existed at the time of delivery, such that Defendant breached the first promise as to those parts. No material dispute exists concerning the improper functioning of the fuel valve, and a reasonable juror could conclude that the free-fall mechanism failed to operate properly pre-delivery (particularly because the record lacks a first-hand account of such test). Furthermore, Defendant has conceded that such issues qualified as defects.

As concerns the balance of Plaintiff's complaints about the Aircraft's performance, Plaintiff has failed to demonstrate that Plaintiff complied with its obligation under the Agreement to inspect the Aircraft pre-acceptance and notify Defendant of any discrepancies. Additionally, with respect to the Aircraft's braking system and tire wear, Plaintiff has not shown that such issues constitute "defect[s]" within the meaning of the Final

Warranty (the definition of which, as explained above, defers to Defendant's interpretation of such term).[15]  In any event, the record does not reasonably support the inference that any issues with the Aircraft (other than the faulty fuel valve and free-fall mechanism) existed in March 2017, the relevant time period for determining whether Defendant breached its primary warranty obligation.[16]  Stated differently, problems with the Aircraft that manifested for the first time after March 2017 cannot constitute breach of Defendant's first promise unless Plaintiff can show that such problems existed at <u>delivery</u>.  Plaintiff has made no such showing.  (<u>See</u> Docket Entry 42 at 11–13 (describing repairs in 2019 and 2020).)

---

[15]  Instead, Plaintiff has (i) denied owing any obligation to inspect the Aircraft for defects (<u>see</u> Docket Entry 55 at 14), despite the provision in the Agreement requiring Plaintiff's inspection before acceptance (<u>see</u> Docket Entry 1-8, ¶ 5), and (ii) impugned Defendant's characterization of certain issues as non-defects (<u>see</u> Docket Entry 42 at 4 n.4), notwithstanding the Final Warranty's restrictive definition of "defect."

[16]  "The seller's warranty is not his personal guarantee concerning the continuous and future operation of the goods which he has sold." <u>Pake v. Byrd</u>, 55 N.C. App. 551, 554, 286 S.E.2d 588, 590 (1982) (internal quotation marks omitted).  Accordingly, "[t]o determine whether a warranty is one of future performance, [courts] must look to the language of the warranty itself to determine whether it explicitly guarantees the future performance of the goods." <u>Trans-Spec Truck Serv. v. Caterpillar Inc.</u>, 524 F.3d 315, 323 (1st Cir. 2008).  When, as here, an agreement includes a repair-or-replace provision, "[such] promise warrants the future performance of <u>the warrantor</u>, not <u>the goods</u>," <u>id.</u> (emphasis added). Consistent with that principle and the terms of the Final Warranty, Plaintiff has not (explicitly) argued that Defendant warranted the future performance of the Aircraft.  (<u>See generally</u> Docket Entry 42 at 17–23 (contending only that identified defects breached warranty and that limited remedy fails of its essential purpose).)

Turning to Defendant's repair-or-replace obligation, as to the fuel valve and free-fall mechanism, Plaintiff has not disputed that Defendant remedied such errors upon discovery in October 2017 and July 2019, respectively. (See generally Docket Entry 42 at 8–10.) Nor has Plaintiff shown that Defendant breached such obligation as to any other part or condition; instead, Plaintiff's sole challenge relates to the adequacy of the limited repair-or-replace remedy, insofar as Plaintiff has asserted its entitlement to an alternate remedy (revocation) and damages beyond what the Final Warranty contemplates. (See id. at 19–23.) Such relief remains available only if the Final Warranty's limited remedy fails of its essential purpose and/or the exclusion of consequential damages fails as unconscionable. The undersigned addresses those topics in turn.

**B. Adequacy of Repair-or-Replace Remedy**

Plaintiff has insisted that (i) the "limited repair or replace remedy" to which it agreed fails of its essential purpose, and (ii) Plaintiff remains entitled to revoke its acceptance. (See Docket Entry 42 at 19–23.) More specifically, as grounds for revocation, Plaintiff has contended that (i) the Aircraft qualified as defective at the time of delivery, (ii) Plaintiff lacked knowledge about such defects (or a reasonable means of discovery), (iii) Defendant failed to repair such defects within a reasonable period, (iv) such defects impaired the value of the Aircraft, and (v) Plaintiff adequately and timely revoked its acceptance. (See

-28-

<u>id.</u> at 22-23.) Conversely, Defendant has maintained that "[Plaintiff] cannot renege on its agreement to limit remedies" (Docket Entry 44 at 18 (emphasis omitted)) because Defendant satisfactorily repaired "every alleged warrantable 'defect'" (<u>id.</u> at 20). As to revocation, Defendant has contended that Plaintiff (i) has not demonstrated impairment to the Aircraft's value and (ii) failed to revoke acceptance in a timely manner. (<u>See</u> <u>id.</u> at 20-22.)

"If the parties intend to conclude a contract for sale within [] Article [2,] they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract." N.C. Gen. Stat. § 25-2-719, Official Comment 1. Article 2 contemplates non-enforcement of "an apparently fair and reasonable clause" when, under the "circumstances[, it] fails in its purpose or operates to deprive either party of the substantial value of the bargain . . . ." <u>Id.</u> In other words, "[a] limited, exclusive remedy fails of its essential purpose when unanticipated circumstances preclude the seller from providing the buyer with the remedy to which the parties agreed." <u>Farrar & Farrar Farms v. Miller—St. Nazianz, Inc.</u>, 477 F. App'x 981, 988 (4th Cir. 2012) (internal quotation marks omitted). For example, one court concluded that a liquidated-damages provision failed of its essential purpose when "[a] plaintiff paid over two million dollars for [a computer]

-29-

system which it ultimately failed to use because of alleged permanent incapacities of the system," Wayne Mem'l Hosp., Inc., v. Electronic Data Sys. Corp., No. 87-905-CIV-5, 1990 WL 606686, at *7 (E.D.N.C. Apr. 10, 1990) (unpublished). In contrast, replacement qualified as an adequate limited remedy when "[the seller] provided replacements for the defective [product] within a reasonable period of time, just as its warranty contemplated," Farrar & Farrar Farms, 477 F. App'x at 988.

Here, the Court should deem the repair-or-replace remedy adequate under the circumstances because no reasonable juror could adjudge Defendant's repairs ineffective or untimely. Turning first to effectiveness, Plaintiff has failed to identify any defect within the scope of the Final Warranty that Defendant failed to correct upon notification by Plaintiff or discovery by Defendant. For example, Plaintiff has forecast no evidence that, after Defendant replaced part of the windshield, such component failed again, requiring further repairs and rendering the Aircraft unusable. (See Docket Entry 46-2 at 48-50.) Tyler did testify that another part of the original windshield (which Defendant had not replaced) had begun to fail sooner than expected. (See id.) At best, such evidence shows latent problems that Defendant ought to have noticed or parts that failed sooner than Plaintiff anticipated. Neither showing undermines the uncontested record evidence that Defendant properly responded to defects as they

arose, consistent with the repair-or-replace remedy. To the extent Plaintiff has grounded its claim in issues with the braking system or tire wear, the Final Warranty defers to Defendant's exclusion of such components, and neither problem rendered the Aircraft unavailable or unusable.

As far as the timeliness of Defendant's repairs, Plaintiff has seized upon the delay between manufacture and manifestation of a problem (or Defendant's diagnosis, absent such manifestation). However, defects about which Plaintiff remained unaware cannot have impaired the contemporaneous utility and value of the Aircraft to Plaintiff. For example, Defendant cannot have breached its repair-or-replace obligation in November 2018 concerning parts (such as "two fuel pump metering units[ and] the compressor drive module" (Docket Entry 42 at 11)) that did not require replacement until July 2019. (See id.) Upon notification by Plaintiff or discovery by Defendant, no defect persisted unaddressed, such that Defendant timely complied with the remedy it promised to Plaintiff. It bears repeating that Defendant never warranted the continuous, hassle-free operation of the Aircraft, see Pake, 55 N.C. App. at 554, 286 S.E.2d at 590; Defendant merely vowed to correct defects if and when they arose. Under the circumstances, no reasonable juror could conclude that periodic repairs deprived Plaintiff of the "substantial value of the bargain," N.C. Gen. Stat. § 25-2-719,

Official Comment 1, especially given Plaintiff's frequent use of
the Aircraft.

## C. Validity of Damages Limitation

In discovery, Plaintiff asserted that it "seeks recovery of
consequential damages of at least $15 million for business lost due
to the Aircraft's unavailability" (Docket Entry 46-1 at 13).
However, aside from a passing reference to the "take-it-or-leave-
it" nature of the Agreement (see Docket Entry 42 at 4), no
discussion of consequential damages (or the validity of the Final
Warranty's exclusion of the same) appears in the briefing
associated with Plaintiff's Motion (see id. at 1–23; Docket Entry
57 at 1–13).  In opposing Defendant's Motion, Plaintiff has
reasserted its claim to consequential damages (in a footnote) while
acknowledging that its evidence of consequential damages remained
"inadequate" and conceding that it lacked entitlement to such
damages "absent additional evidence."  (Docket Entry 55 at 23
n.10.)  In contrast, Defendant has insisted that the Agreement and
Final Warranty validly foreclose any demand for consequential
damages (see Docket Entry 44 at 7–9, 22–23) and that, in any event,
such demand fails as speculative (see id. at 23–24).

North Carolina law authorizes parties to agree to limit or
exclude consequential damages, as long as such agreements do "not
operate in an unconscionable manner," N.C. Gen. Stat. § 25-2-719,
Official Comment 3.  "North Carolina courts find contracts

-32-

unconscionable only when 'no decent, fairminded person would view the [contract's] result without being possessed of a profound sense of injustice.'" <u>Severn Peanut Co. v. Industrial Fumigant Co.</u>, 807 F.3d 88, 92 (4th Cir. 2015) (quoting <u>Gas House, Inc. v. Southern Bell Tel. & Tel. Co.</u>, 289 N.C. 175, 182, 221 S.E.2d 499, 504 (1976)). "[I]t is rare that a limitation of remedy will be held unconscionable in a commercial setting since the relationship between business parties is usually not so one-sided as to force an unconscionable limitation on a party." <u>Byrd Motor Lines, Inc. v. Dunlop Tire & Rubber Corp.</u>, 63 N.C. App. 292, 296, 304 S.E.2d 773, 776 (1983).

Here, in light of Plaintiff's failure to demonstrate its entitlement to consequential damages and Defendant's argument in support of enforcing the agreed-upon exclusion, the Court should decline to invalidate the Agreement or Final Warranty as unconscionable. Plaintiff and Defendant transacted as sophisticated parties in a commercial setting, and nothing in the record supports the notion that "one-sided" dealings forced Plaintiff to accept any unfair terms. <u>See</u> <u>id.</u> As explained in the preceding subsection, the repair-or-replace remedy remained available and adequate under the circumstances.

## D. Other Issues

Defendant has sought to exclude as unreliable the testimony of Plaintiff's expert witnesses, Chris Gillis ("Gillis") and William

-33-

"Bo" Fielding ("Fielding").  (Docket Entry 47 at 1; see also Docket Entry 48 (supporting memorandum).)  Plaintiff responded in opposition (Docket Entry 51), and Defendant replied (Docket Entry 56).  Defendant also has requested an order striking a notice filed by Plaintiff (Docket Entry 59) (the "Notice"), as well as the exhibits attached to the Notice (Docket Entries 59-1, 59-2) (the "Exhibits"), on the grounds that Plaintiff failed to authenticate the Exhibits, explain the basis for admitting the hearsay information contained therein, or "provide any expert testimony connecting any purported event listed in the [Exhibits] with any issue involved in this case" (Docket Entry 60 at 3).  In the alternative, Defendant has asked the Court to "disregard the Notice and [the E]xhibits in ruling on [Plaintiff's Motion and Defendant's Motion]" (id.).

Turning first to the Expert Motion, Gillis expressed the opinion that the "Aircraft has experienced more defects, and required more service and repairs, than should be expected of a new HA-420 HondaJet, and relative to other aircraft in the same class." (Docket Entry 46-10 at 8.)  Fielding's opinion relates to the resale value of the Aircraft, in light of its maintenance history. (See Docket Entry 46-12 at 2.)  Given that those opinions do not alter the basis for summary judgment for Defendant, the Court should deny the Expert Motion as moot.  See, e.g., Connor v. Covil Corp., __ F.3d __, __, 2021 WL 1618641, at *3 n.6 (4th Cir. Apr.

-34-

27, 2021) (declining "to address the *Daubert* issue" in light of independent resolution granting summary judgment).

As concerns the Motion to Strike, the Court should disregard the Notice and the Exhibits. Plaintiff tendered the Notice several months after the close of discovery (see Text Order dated July 14, 2020 (extending discovery deadline to August 31, 2020); Docket Entry 59 (filed March 8, 2021)) and elected not to respond to the Motion to Strike (see Docket Entries dated Mar. 26, 2021, to present), thus waiving any opposition to the relief requested therein, see M.D.N.C. LR 7.3(k) ("If a respondent fails to file a response within the time required by this rule, the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice.").

## CONCLUSION

Given the forecast of evidence, the Court should grant summary judgment for Defendant and deny the same for Plaintiff. The parties agreed that Defendant would deliver to Plaintiff a defect-free Aircraft, which Plaintiff would inspect prior to acceptance, and that Defendant would fix certain defects within defined parameters. Although a number of problems plagued the Aircraft, Defendant properly remedied all issues that fell within the scope of the Final Warranty. As a result, Plaintiff lacks entitlement to alternate remedies as a matter of law.

-35-

**IT IS THEREFORE RECOMMENDED** that Plaintiff's Motion (Docket Entry 41) be **DENIED.**

**IT IS FURTHER RECOMMENDED** that Defendant's Motion (Docket Entry 43) be **GRANTED.**

**IT IS FURTHER RECOMMENDED** that the Expert Motion (Docket Entry 47) be **DENIED AS MOOT.**

**IT IS FURTHER RECOMMENDED** that the Motion to Strike (Docket Entry 60) be **GRANTED IN PART,** in that the Court should disregard the Notice and the Exhibits.

_/s/ L. Patrick Auld_
**L. Patrick Auld**
**United States Magistrate Judge**

May 26, 2021